**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANDREW AMEND, IGOR GELMAN, SUSAN BURDETTE, and ZACHARY DRAPER, on behalf of themselves and all others similarly situated, | No. |
| Plaintiffs, | CLASS ACTION |
| Versus | JURY TRIAL DEMANDED |
| AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., | |
| Defendants, | |

## CLASS ACTION COMPLAINT

NOW INTO COURT, through the appearance of undersigned counsel, come Plaintiffs Andrew Amend, Igor Gelman Susan Burdette, and Zachary Draper ("Plaintiffs").  Having availed themselves of the provisions of federal and state antitrust laws, state consumer protection statutes, unjust enrichment and Rule 23 of the Federal Rules of Civil Procedure, and on behalf of themselves and all others similarly situated (the "Class"), Plaintiffs bring this action for damages and equitable relief against the American Express Company and American Express Travel Related Services Company, Inc. (collectively "American Express" or "Amex" or "Defendants").

This Complaint is alleged upon information and belief, except as to those allegations which pertain to the named Plaintiffs, which are alleged on Plaintiffs' personal knowledge.

## INTRODUCTION AND OVERVIEW

1.      This is an antitrust action. Plaintiffs respectfully submit that Amex entered into illegal vertical agreements, arrangements, contracts, or combinations with Merchants known as

Anti-Steering Rules or Non-Discrimination Provisions (referred to herein as "Anti-Steering Rules"), causing harm to consumers.

2.     More specifically, the Anti-Steering Rules induced Merchants who accept American Express credit cards to artificially inflate the cost of their wares, goods and services. These increased prices were ultimately borne by consumers, regardless of whether or not they held or used an American Express card/co-branded card to make their purchases.

3.     Plaintiffs herein are holders of MasterCard, Visa, and/or Discover credit cards. They do not hold American Express cards/co-branded cards (including Amex co-branded credit cards issued by American Airlines, Costco Wholesale Corporation, Delta Airlines, Hilton Honors Worldwide, JetBlue Airways, Lowe's, Macy's and/or Starwood Hotels). Plaintiffs' action is brought on behalf of themselves and others similarly situated and challenges the Anti-Steering Rules that enjoin participating Merchants from encouraging or "steering" consumers to pay for their transactions with credit cards that cost the Merchants less to accept.

4.     The Anti-Steering Rules lead to increased prices charged to customers by virtue of the following:

a)  Merchants incur a fee (known as the "merchant discount rate") each time a customer swipes an Amex or other credit card.  This fee is typically a percentage of the overall sale, and is revenue for Amex (or other credit card company, such as Visa, MasterCard, or Discover).

b)  In the absence of the Anti-Steering Rules, Merchants would be free to offer Plaintiffs and other Class members incentives to use payment products that carry lower merchant discount fees than do Amex-branded payment cards.

c)  However, with the Anti-Steering Rules in place, credit card networks such as Amex, Visa, MasterCard or Discover have an incentive to charge Merchants inflated prices for the credit card services.

d)  To absorb the fees associated with the "merchant discount rate," participating Merchants ultimately charge higher prices to Class Members for the goods and services they purchased from these Merchants during the Class Period.

5.  In 2010, the United States and the attorneys general of seventeen states brought an antitrust enforcement action in the United States District Court for the Eastern District of New York against Visa Inc. ("Visa"), MasterCard International Incorporated ("MasterCard"), American Express Company, and American Express Travel Related Services Company.  That action, captioned *United States v. American Express Co., et al.*, No. 1:10-cv-04496-NGG-RER (E.D.N.Y.) ("*U.S. v. Amex*"), challenged that each network's anti-steering rules were anticompetitive restraints in violation of Section One of the Sherman Antitrust Act.[1] In that litigation, Visa and MasterCard entered into consent decrees, voluntarily agreeing to remove or revise a majority of the restraints being opposed. Amex, on the other hand, chose to litigate the allegations through a seven-week bench trial, after which the Court found that Amex's Anti-Steering Rules are unlawful restraints on trade, violating Section One of the Sherman Act, 15 U.S.C. § 1.  The Court issued a decision containing findings of fact and conclusions of law to this effect dated February 19, 2015.  *See U.S. v. Amex*, Dkt. No. 619 (the "*U.S. v. Amex* Decision").

---

[1]    This action does not bring claims on behalf of consumers in the seventeen states participating in the *In re American Express Anti-Steering Rules Antitrust Litigation*, No. 1:11-md-02221- NGG-RER  (MDL  No.  2221) (E.D.N.Y.), but is asserted on behalf of consumers in non-participating states whose laws permit consumers to bring antitrust actions.

Plaintiffs and other Class members been negatively affected by Amex's enforcement of the Anti-Steering Rules, paying increased prices for products and services they purchased using MasterCard, Visa, and Discover payment cards. The Court in *U.S. v. Amex* found, in pertinent part: "Merchants facing increased credit card acceptance costs will pass most, if not all, of their additional costs along to their customers in the form of higher retail prices." *U.S. v. Amex* Decision at 113 (citing testimony that that "an economically rational merchant is going to pass [the higher costs of accepting payments] on to its customers," and "prices are going to go up with the merchant for everybody"; *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d at 38, 56 (2d Cir. 2010) (noting a "tax increase, like any cost, will likely be passed on to consumers in the form of higher prices"); *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 719 (D.C. Cir. 2001) ("[T]he antitrust laws assume that a retailer faced with an increase in the cost of one of its inventory items 'will try so far as competition allows to pass that cost on to its customers in the form of a higher price for its product.'") (quotation omitted)).  Accordingly, higher retail prices caused by the Anti-Steering Rules affect all customers.

6.     The Anti-Steering rules prohibit Merchants from informing Plaintiffs and other Class members about how expensive their payment product is to the merchant, and further forbids providing customers an incentive to switch to an alternative payment product that would be less costly to the Merchant (*i.e.*, discounts for payment using an alternative credit card). If Merchants were free to give their customers incentives to use less costly credit cards, then Amex risks losing business as consumers respond to these incentives.  Amex would thus be pressured to lower its merchant discount fees, facing competition in the market for providing credit card network services to Merchants. The Anti-Steering Rules effectively eliminate this risk and insulate Amex from any meaningful competition.   Thus, the Anti-Steering Rules entrench

Amex's position of market power, allowing Amex to extract supra-competitive discount rates (*i.e.*, swipe fees) from Merchants within the Class Jurisdictions.

7.     As a consequence of the foregoing limitations imposed by the Anti-Steering Rules, a merchant seeking to recoup the supra-competitive fees they pay to Amex, Visa, MasterCard, and Discover has no choice but to pass those expenses on to the consumer by increasing the retail prices charged for goods and services. Price markups are across-the-board, and do not distinguish between Amex cardmembers or shoppers using other forms of payment. Rather than the markup coming exclusively from Amex cardmembers, the Anti-Steering Rules effectively compel consumers using other types of payment to subsidize the incredible "perks" enjoyed by Amex cardmembers, including frequent flier miles, free gifts and cash-back rewards.

8.     The Anti-Steering Rules flatly preclude Merchants from seeking to compete with one another on the dimension of whether and how they "price" their acceptance services to consumers.  Under these restrictive commandments, Merchants "shalt not" engage in price competition with respect to the provision of payment card acceptance services. Antitrust laws provide no such justification for imposing this unreasonable ban on competition among Merchants.

9.     Because Amex prohibits Merchants from offering incentives to Plaintiffs and other Class members to use payment cards that carry lower merchant discount fees than do Amex-branded payment cards, Merchants pay Amex excessive fees. The cost of excessive fees is passed on to the consumer, via the systematic over-pricing of products and services sold to Plaintiffs and other Class members. Through this action, Plaintiffs challenge the imposition of what amounts to an undisclosed "markup" on to the cost of every retail transaction made by

Plaintiffs and other Class members with Merchants accepting American Express credit cards in the Class Jurisdictions.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action for damages pursuant to state antitrust, unfair competition and consumer protection laws, including but not limited to restitution, actual, multiple, and exemplary damages and secure other relief against the Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses.

11.     This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, because this is a class action in which the amount in controversy exceeds the sum of $5 million, exclusive of interests and costs, and in which some members of the proposed Class are citizens of a state different from the Defendants.

12.     This Court also has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5 million and at least one Plaintiff or class member is from a state different from one defendant.

13.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected trade and commerce discussed below has been carried out in this district, and the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district. Further, venue is proper here because this district is the transferee district of an Order of the Judicial Panel on Multi-District Litigation, dated February 7, 2011.

14.     This Court has *in personam* jurisdiction over the Defendants because the Defendants, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) are at home in this district and transacted business in this district; (b) had substantial aggregate contacts with this forum; and/or (c) were engaged in an illegal restraint of trade that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.

15.     Defendants' conduct has caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

16.     Defendants' actions were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.

## PARTIES

**A.     Plaintiffs**

17.     Named Plaintiff in this action is Andrew Amend, a resident of Wichita, Kansas. During the relevant Class Period, Mr. Amend purchased products or services using his MasterCard, Visa, or Discover credit card(s) from a merchant that accepts American Express payment cards. As a result of Defendants' actions described herein, Plaintiff paid more than he would have paid for the products or services in the absence of Defendants' conduct. Accordingly, Mr. Amend has sustained injury as a result of the Defendants' actions and was therefore injured in his business and/or property.

18.     Also named plaintiff is Igor Gelman, a resident of Lake Worth, Florida. During the relevant Class Period, Mr. Gelman purchased products or services using his MasterCard, Visa, or Discover credit card(s) from a merchant that accepts American Express payment cards.

As a result of Defendants' actions described herein, Plaintiff paid more than he would have paid for the products or services in the absence of Defendants' conduct. Accordingly, Mr. Gelman has sustained injury as a result of the Defendants' actions and was therefore injured in his business and/or property.

19.     Also named plaintiff is Susan Burdette, a resident of Santa Fe, New Mexico. During the relevant Class Period, Ms. Burdette purchased products or services using his MasterCard, Visa, or Discover credit card(s) from a merchant that accepts American Express payment cards. As a result of Defendants' actions described herein, Plaintiff paid more than she would have paid for the products or services in the absence of Defendants' conduct. Accordingly, Ms. Burdette has sustained injury as a result of the Defendants' actions and was therefore injured in her business and/or property.

20.     Also named plaintiff is Zachary Draper, a resident of Reno, Nevada. During the relevant Class Period, Mr. Draper purchased products or services using his MasterCard, Visa, or Discover credit card(s) from a merchant that accepts American Express payment cards. As a result of Defendants' actions described herein, Plaintiff paid more than he would have paid for the products or services in the absence of Defendants' conduct. Accordingly, Mr. Draper has sustained injury as a result of the Defendants' actions and was therefore injured in his business and/or property.

**B.     Defendants**

21.     Defendant American Express Company is a New York corporation with its principal place of business in New York, New York.

22.     Defendant American Express Travel Related Services Company, Inc. is a Delaware corporation, with its principal place of business in New York, New York, and is a

wholly owned subsidiary of American Express Company. American Express Travel Related Services Company, Inc. is generally responsible for all aspects of the payment card business conducted under the American Express brand, including the operation of the American Express network. Depending on context, as used herein, the terms "American Express" or "Amex" may refer to Defendants or the American Express network or the American Express brand.

23.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## CLASS ACTION ALLEGATIONS

24.     Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) seeking certification of fourteen separate statewide damage classes asserting claims for damages under the antitrust statutes and/or consumer protection statutes, and law of unjust enrichment, of fourteen jurisdictions:

    a)  California,

    b)  Washington D.C. (hereinafter, "District of Columbia"),

    c)  Florida,

    d)  Kansas,

    e)  Maine,

    f)  Nevada,

    g)  New Mexico,

    h)  New York,

i)  North Carolina,

j)  North Dakota,

k)  Oregon,

l)  South Dakota,

m)  West Virginia, and;

n)  Wisconsin.

Collectively, these classes are referred to herein as the "State Damages Classes."

25.  The State Damages Classes are defined by and comprised of:

a)  All persons or entities residing in [State] that do not hold an Amex credit card or an Amex co-branded credit card, and that used a MasterCard, Visa, and/or Discover credit card to purchase products or services from Merchants in [State] that accepted Amex-branded general purpose credit or charge cards, during the longest period of time permitted by the applicable statute of limitations (the "Class Period").

b)  Excluded from the Class are Defendants, their parent companies, subsidiaries, agents and affiliates, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

26.  Plaintiffs respectfully suggest that the exact number of Class members is not knowable because such information is in the exclusive control of Defendants, MasterCard, Visa, or Discover. Further, due to the nature of the trade and commerce involved, Plaintiffs respectfully suggest there are potentially millions of Class members, such that joinder of all Class members is impracticable.

27.     Questions of law or fact common to Class members predominate over any questions affecting only individual members, including;

    a)     Whether the Defendants engaged in an agreement, contract, or combination to restrain trade;

    b)     Whether Defendants' conduct caused Class members to pay more for products or services than they would have in the absence of the Defendants' conduct;

    c)     Whether Plaintiff and the other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

    d)     The scope of any injunctive relief to which Plaintiff and the other members of the Class are entitled.

28.     Plaintiffs' claims are typical of the claims of the Class because, like other Class members, Plaintiffs do not hold an American Express card or co-branded American Express card, and made purchases using their MasterCard, Visa, and/or Discover payment cards from a merchant(s) that accepted American Express general purpose credit cards.

29.     Plaintiffs will fairly and adequately represent the interests of the Class in that they have no conflict with other members of the Class. Furthermore, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

30.     Prosecuting separate actions by individual Class members risks inconsistent results and varying adjudications, establishing incompatible standards of conduct for Defendants.

31.     This class action is superior to any other method to fairly, efficiently, and justly adjudicate this dispute. There will be no extraordinary difficulty in the management of this class action.

## FACTUAL BACKGROUND

**A.     Industry Background**

32.     When a consumer presents an Amex-branded credit card for payment, the Merchant swipes the card, electronically transmitting a record of the transaction to Amex.

33.     Next, the Merchant's bank account receives monies from Amex that generally with the purchase, but is discounted from the full transaction amount.  The discounted amount represents a "merchant discount fee" that Amex charges retailers for the use of the card.  The "merchant discount fee" is an expense for the Merchant, but represents revenue for Amex.  The "merchant discount fee" is typically a set percentage of the total purchase amount.

34.     The American Express Defendants charge higher "merchant discount rates" than other competing credit cards. In a purely competitive marketplace, a Merchant would be permitted to direct its customers to payment products other than Amex, allowing the Merchant to recover the full sales price of its goods and services.  Further, the Merchant's prices would not be set to recover the "merchant discount rate," giving the Merchant greater flexibility to offer lower prices to all consumers, including Plaintiffs and other Class members in this action.

**B.     The Anti-Steering Rules**

35.     During the Class Period, Amex's Anti-Steering Rules have been and are contained in Defendants' acceptance agreements which Defendants require Merchants to enter. During the Class Period over 3 million Merchants nationwide were contractually bound by Defendants' Anti-Steering Rules.

36. There are many ways that a merchant might steer transactions to a less costly payment product, including:

    a) offering a discount for using a payment product that is cheaper to the merchant, such as Discover, Visa, and MasterCard branded credit cards, while not offering that discount for Amex cards, or any particular type of Amex cards;

    b) verbally asking customers if they would mind using a different payment product, as opposed to Amex cards, or any particular type of Amex cards;

    c) posting signage indicating a preference for a cheaper payment product;

    d) posting the decals and signs of less expensive payment networks and yet not posting the decal or sign of Amex;

    e) imposing a small charge (sometimes referred to as a "surcharge") for using all or any subset of Amex-branded payment cards (where the merchant is located in one of the 40 states and the District of Columbia where such surcharges are legal); or

    f) taking any other actions that Merchants may yet devise if they were not constrained by the anticompetitive rules against steering.

37. Amex's Anti-Steering Rules, however, strictly prohibit Merchants from engaging in such pro-competitive practices. As set forth in Amex's "Merchant Reference Guide-U.S." beginning in or around 2007, Merchants must not:

    a) indicate or imply that it prefers, directly or indirectly, any Other Payment Products over Amex's "Card;"

    b) try to dissuade Cardmembers from using the Card;

c)      try to persuade or prompt Cardmembers to use any Other    Payment Products or any other method of payment (*e.g.*, payment by check);

d)      impose any restriction, conditions, or disadvantages when the Card is accepted that are not imposed equally on all Other Payment Products, except for ACH funds transfer, cash, and checks; or

e)      promote any Other Payment Products (except the merchant's own private label card that it issues for use solely at the merchant's Establishments) more actively than it promotes Amex's Card.

38.     These prohibitions are anticompetitive vertical restraints.

39.     The above iteration of Amex's Anti-Steering Rules, taken from the Merchant Payment Guide, is substantially mirrored in American Express's card acceptance agreements with all U.S. Merchants.  *See U.S. v. Amex* Decision at 25-26.

40.     American Express actively monitors for non-compliance and vigorously enforces the restraints where steering or "suppression" is found to have occurred. Upon information and belief, Amex monitors large Merchants using oversight by the Merchant's client manager at American Express, random on-site visits, and reports from cardholders.  Smaller, unmanaged Merchants' compliance is monitored through cardholder complaints and by monitoring the Merchants' charge volume.

41.     As a result of this monitoring, when Amex identifies a situation in which a merchant is believed to be steering, it will raise the issue through the Merchant's assigned client manager or through its small merchant team.  If the Merchant does not voluntarily agree to terminate any activity encouraging customers to use a product other than American Express to

consummate the transaction, Amex will take corrective action.  Corrective action can include terminating the merchant's card acceptance agreement with the network.

42.    The intended and actual result of Amex's Anti-Steering Rules is near-total insulation from price-based competition in the payment card acceptance services markets. The Anti-Steering Rules block Amex-accepting Merchants from encouraging their customers to use any credit or charge card other than an Amex card, even where that other card imposes a less costly burden upon the Merchant to accept. Steering among the various credit card brands could be accomplished by offering discounts or other monetary incentives to consumers who pay with a particular type of card, offering non-monetary benefits for using a lower-cost card, displaying the logo of one brand more prominently than others, expressing the merchant's preference as to which type of card it would rather accept, or posting each card's cost of acceptance and letting customers make their own decisions as to which mode of payment they prefer. Under Amex's Anti-Steering Rules, however, a merchant can do none of these things.

43.    A competitor network or a new market entrant may offer to provide comparable services to retailers at a price far lower than that charged by Amex. Such a pro-competitive strategy, however, will not allow the competitor to gain any market share from Amex, because the Merchant is disabled by the Anti-Steering Rules from attempting to influence its customers' card choices and have customers choose the less expensive card provider.

44.    In the absence of Amex's Anti-Steering Rules, moreover, the fees that Amex charges Merchants to process transactions on the Amex payment card network would be greatly diminished. Accordingly, Merchants would be able to lower prices on consumers (*i.e.*, Plaintiffs and other Class members) because the merchant would not be attempting to recoup excessive costs and fees.

45.     Further, beyond achieving such benefits, the abolition of the Anti-Steering Rules would enable consumers to avoid the cost of all the Amex frequent flier miles, Membership Rewards Points®, travel insurance and other perquisites that are financed, at least in part, out of merchant discount fees. Presently, the benefits enjoyed by Amex cardmembers are largely subsidized by all consumers, including the Plaintiffs and other Class members. If the merchant were free to offer inducements to use less expensive payment forms – or, conversely, to assess a surcharge for using expensive payment products – then only customers who nonetheless choose to use an expensive payment product would be compelled to pay for the privilege.

## MARKET DEFINITION AND MARKET POWER

46.     Plaintiffs respectfully suggest that Amex wields substantial market power.

**A.     Relevant Market: General Purpose Credit and Charge Card Network Services (GPCC Network Services) in the United States**

47.     The relevant product market consists of the services provided to Merchants for accepting credit and charge cards, referred to as "General Purpose Credit and Charge Card Network Services," or "GPCC Network Services." These GPCC Network Services include the core enabling functions provided by networks, which allow Merchants to capture, authorize, and settle transactions for customers who elect to pay with their credit or charge card.

48.     The GPCC Network Services market is occupied by just four major competing firms: Amex, Visa, MasterCard and Discover. Barriers to entry into the relevant market are high.

49.     GPCC Network Services is a distinct product market because merchant consumers exhibit little price sensitivity, and the networks provide core services that cannot reasonably be replaced by other sources.   There are no products that are reasonably interchangeable with the network services provided by Amex, Visa, MasterCard and Discover.

50.     American Express's public statements to courts, federal agencies and investors prior to the Government's lawsuit were consistent, for example, that Amex did not compete with debit card networks because of the limited substitutability between credit and debit. For example, in American Express's 2009 Form 10-K, the company stated that "[t]he ability to substitute debit cards for credit and charge cards is limited because there is no credit extended and the consumer must have sufficient funds in his or her demand deposit account to pay for the purchase at the time of the transaction as opposed to charge cards where payment is due at the end of the month or credit cards where payment can be extended over a period of time."

51.     The relevant geographic market is the United States, including each of the fourteen states upon which the claims in this action are brought.

52.     As a result of the challenged Anti-Steering Rules, American Express's ability to impose supra-competitive prices upon Merchants is not meaningfully constrained by price competition from other payment networks. If Amex increases merchant prices significantly over a competitive baseline – or if a competitor network, such as Discover or MasterCard, drops its merchant fees by a significant amount – the Merchants have no power to steer transaction volume away from the expensive Amex network over to less-costly competitor networks. In a properly functioning market, Amex could not raise its prices above a competitive baseline without having transaction volume migrate to less expensive networks. In economic terms, then, there is extraordinarily low cross-elasticity of demand as between American Express acceptance services and those offered by other networks. As a result, the product dimension of the relevant market is properly limited to acceptance services for the American Express network.

**B.** **Market Power**

53.     American Express has market power in the market for American Express card acceptance services.

54.     Examples of Amex's market power during the relevant period include, but are not limited to, imposing significant price increases on Merchants without any meaningful merchant attrition, due in large part to Amex's extremely loyal cardholder base. Merchants' ability to resist Amex's anticompetitive vertical restraints such as the Anti-Steering Rules and the significant price increases they enable, by ending acceptance of Amex cards, is checked by a substantial segment of Amex's cardholder base who insist on paying with their Amex cards and who would shop elsewhere or spend less if unable to use their preferred credit card.

55.     Amex's cardholder insistence and loyalty is derived from several sources, most significantly from Amex's Membership Rewards program and other rewards programs which induce loyalty with strong incentives such as reward points for purchases where the points can be redeemed with Amex or with Amex's business partners. For example, members receive points for purchases made with their Amex cards, and may then redeem those points with Amex or one of its redemption partners for merchandise, gift cards, frequent flyer miles, statement credits, or other goods and services.

56.     Cardholders valuing their ability to earn points, miles, or cash rebates often centralize their spending on their Amex cards to maximize these benefits.   Accordingly, Merchants cannot simply "stop" accepting Amex cards (thus foregoing the related revenues associated with loyal Amex-insistent customers), as it is commercially impractical.

57.     Amex maintains supra-competitive discount rates; charging significantly different prices to different groups of Merchants for reasons unrelated to the cost of providing service.

58.     Further, Amex establishes prices regardless of the actual cost of providing services.

59.     Amex market power is further evidenced by its large market share (over 25% in the relevant market).  The market is highly concentrated (primarily four major firms – Visa, American Express, MasterCard, and Discover) amongst just four firms, and there are high barriers to entry.

60.     The substantial barriers to entry have resulted in no successful new entrants in the U.S. credit card network business for over 25 years.

**INJURY TO THE CLASS**

61.     Anti-Steering Rules impair horizontal, inter-brand price competition amongst Amex, Visa, MasterCard and Discover during the Class Period.  As a proximate and direct result, Plaintiff and the Class are paying supra-competitive prices for goods and services purchased from Merchants accepting Amex cards.

62.     The Anti-Steering Rules deny Merchants the opportunity to influence their customers' payment decisions.  Merchants cannot encourage consumers to use less expensive credit cards in transactions.

63.     The rules insulate Amex, Visa, MasterCard and Discover from price-based network competition, thereby enabling them to extract supra-competitive discount fees. In the absence of the Anti-Steering Rules, Merchants would be charged lower merchant discount rates than they did and presently do, and Merchants would not be compelled to pass the supra-competitive prices on the Plaintiffs and other Class members in the form of higher retail prices.

64.     Amex's rules inflict upon Plaintiffs and other Class members injury in the form of overcharges.  The overcharge represents the difference between (i) the price of products or

services paid by Plaintiffs and other Class members to Merchants who incur fees for processing transactions on cards that are subject to Amex's Anti-Steering Rules, and (ii) the price of products or services that would be paid by Plaintiffs and other Class members to Merchants who would have incurred fees on those transactions not subject to Amex's Anti-Steering Rules – *i.e.*, if Amex had at all relevant times been exposed to price competition with other payment networks.

65.     Over time, Amex has inflicted new and accumulating injury on Plaintiffs and other Class members, as it has issued new cards and launched new card products subject to the Anti-Steering Rules, and enlisted U.S. banks and other financial institutions to issue cards to run on the American Express network subject to Amex's Anti- Steering Rules.

66.     Amex has undertaken a series of major initiatives designed to cause consumers outside Amex's "traditional" base of corporate and relatively affluent consumers – in effect, they are causing "everyman" consumers to use Amex-branded credit cards for everyday purchases. As a result of Amex's actions in launching and then promoting these mass-market products – including the "Blue" family of revolving credit cards and various co-branded Amex credit cards, among other products – many "everyman" consumers that would otherwise have made purchases using other networks' credit cards, which are relatively less expensive to Merchants, have instead made the same purchases using Amex's mass market credit cards, which carry the same high merchant fees as Amex's corporate, small business and premium charge cards.

67.     Merchants incur significantly higher acceptance costs for the same transaction as a direct and proximate result of the above. Further, because of the Anti-Steering Rules, Merchants cannot minimize these higher costs through pricing, or indeed through ***any*** mechanism other than rejecting American Express cards altogether.  Since rejecting Amex cards

as a payment is commercially and practically unworkable for a Merchant, Plaintiffs and other Class members consequently pay higher prices to Amex-accepting Merchants.

68.     For approximately the last ten years, American Express has established business relationships with other U.S. Banks to issue Amex-branded cards, including:

    a)      MBNA;

    b)      Bank of America;

    c)      Citibank;

    d)      USAA Federal Savings Bank;

    e)      Barclay's/Juniper Bank;

    f)      HSBC;

    g)      GE Money Bank; and

    h)      Pentagon Federal Credit Union.

All of the above are likewise bank-issuer partners are subject to the Anti-Steering Rules, and therefore are burdened by the same consequences, bringing ongoing and accumulating injuries to Plaintiffs and Class members.  But for the Anti-Steering Rules, American Express and its bank issuer partners would not have been able to launch any of these credit card products at discount rates exceeding the rates charged by competitor networks for comparable products.  Merchants are saddled with increased "merchant discount fees," and attempt to recoup these expenses by charging consumers elevated prices.

69.     Further, the above-mentioned agreements have precipitated an escalation of merchant fees on rival networks, as well as Amex's. As a bank issuer stands to make more money by partnering with Amex (thus receiving a portion of the supra- competitive discount fees associated with the Amex network), other companies such as Visa, MasterCard, and Discover are

faced with a dilemma: either they raise their own merchant discount rates (and provide a commensurate portion to their bank issuers), or risk losing their bank issuers to Amex.

70. In 2004, when Visa elevated its merchant fees, its merchant pricing chief William Sheedy specifically cited MBNA's agreement with Amex, as a reason for the hike.

71. As other networks have raised their rates, so too has Amex. The result is a proverbial "arms race" of escalating rates and increasing retail prices that would not be possible but for the Anti-Steering Rules. Further, the Anti-Steering Rules existing across all the credit card networks make it all but impossible for economic forces to drive prices down through the use of ordinary competitive practices.

72. As a proximate, direct and foreseeable result of Amex's Anti-Steering Rules, monitoring, and enforcement of same, Plaintiffs and other Class members have suffered damages in an amount to be established at trial.

## COUNT ONE

### (VIOLATION OF STATE ANTITRUST STATUTES (SHERMAN ACT))

73. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

74. During the Class Period, the Defendants have engaged and continue to engage in continuing agreements, contracts, or combinations with respect to the Anti-Steering Rules in unreasonable restraint of trade and commerce. Further, they have violated the various state antitrust and other statutes set forth below. Among other things, the Anti-Steering Rules represent a vertical non-price restraint that has the effect of restraining inter-brand competition in the market for General Purpose Credit and Charge Card Network Services.

75.     The Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

76.     The Defendants have violated California's Cartwright Act, Cal. Bus. & Prof. Code § 16700, et seq.

    a)    During the Class Period, the Defendants entered into and engaged in continuing unlawful agreements, contracts, or combinations in restraint of the trade and commerce described above, violating Cal. Bus. & Prof. Code § 16720. These unlawful contracts were entered into and effectuated within the State of California.

    b)    The aforesaid violations of Cal. Bus. & Prof. Code § 16720, consisted, without limitation, of continuing unlawful agreements, contracts, and/or combinations by the Defendants.

    c)    The agreements, contracts, or combinations alleged herein have had, inter alia, the following effects: (i) competition in the GPCC Network Services Market has been restrained, suppressed, and/or eliminated in the State of California; (ii) prices paid by Class members using MasterCard, Visa, or Discover payment cards for products and services have been raised, to artificially high, non-competitive levels in the State of California and throughout the Class Jurisdictions; and (iii) those who purchased such products and services have been deprived of the benefit of free and open competition.

    d)    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business

and property in that they paid more for products and services than they otherwise would have paid in the absence of the Defendants' unlawful conduct. As a result of the Defendants' violation of Cal. Bus. & Prof. Code § 16720, Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Cal. Bus. & Prof. Code § 16750(a).

77.   The Defendants have violated the District of Columbia Code § 28-4501, et seq.

a)   The Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market was restrained, suppressed, and eliminated throughout the District of Columbia; (ii) prices of products or services were raised to artificially high levels throughout the District of Columbia; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using MasterCard, Visa, or Discover payment cards paid artificially inflated prices for such products or services.

b)   During the Class Period, the Defendants' illegal conduct substantially affected District of Columbia commerce.

c)   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d)      By reason of the foregoing, the Defendants have entered into agreements, contracts, or combinations in restraint of trade violating District of Columbia Code § 28-4501, et seq.

78.     The Defendants have violated the Florida Antitrust Act of 1980, Fla. Stat. Ann. § 542.15, et seq.

a)      During the Class Period, the Defendants entered into and engaged in continuing unlawful agreements, contracts, or combinations in restraint of the trade and commerce described above violating Fla. Stat. Ann. § 542.15, et seq.  These unlawful contracts were entered into and effectuated within the State of Florida.

b)      The aforesaid violations consisted, without limitation, of continuing unlawful agreements, contracts, and/or combinations by the Defendants.

c)      The agreements, contracts, or combinations alleged herein have had, inter alia, the following effects: (i) competition in the relevant market has been restrained, suppressed, and/or eliminated in the State of Florida; (ii) prices paid by Class members using MasterCard, Visa, or Discover payment cards for products and services have been raised, to artificially high, non-competitive levels in the State of Florida; and (iii) those who purchased such products and services have been deprived of the benefit of free and open competition.

d)      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property in that they paid more for products and services than they

otherwise would have paid in the absence of the Defendants' unlawful conduct.   As a result of the Defendants' violation of Fla. Stat. Ann. § 542.15 et seq., Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorney's fee pursuant to Fla. Stat. Ann. § 542.22.

e)   Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Fla. Stat. Ann. § 542.151, et seq.

79.   The Defendants have entered into unlawful restraints of trade in Kansas and have violated Kan. Stat. Ann. § 50-101, et seq.

a)   The Defendants' agreements, contracts, or combinations have had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout Kansas; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout Kansas; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid supra-competitive, artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

b)   During the Class Period, the Defendants' illegal conduct substantially affected Kansas commerce.

c)   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d)      By reason of the foregoing, the Defendants have entered into agreements, contracts, or combinations in restraint of trade, violating Kan. Stat. Ann. § 50-101, et seq.

e)      Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Kan. Stat. Ann. § 50-101, et seq.

80.     The Defendants have violated the Maine Revised Statutes, Me. Rev. Stat. Ann. 10, § 1101, et seq.

a)      The Defendants' agreements, contracts, or combinations have had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout Maine; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout Maine; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

b)      During the Class Period, the Defendants' illegal conduct substantially affected Maine commerce.

c)      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d)      By reason of the foregoing, the Defendants have entered into agreements, contracts, or combinations in restraint of trade, violating Me. Rev. Stat. Ann. 10, § 1101, et seq.

e)      Accordingly, Plaintiffs and members of the Class seek all relief available under Me. Rev. Stat. Ann. 10, § 1101, et seq.

81.     The Defendants have violated the Nevada Unfair Trade Practice Act, Nev. Rev. Stat. Ann. § 598A.010, et seq.

a)      The Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout Nevada; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout Nevada; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

b)      During the Class Period, the Defendants' illegal conduct substantially affected Nevada commerce.

c)      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d)      By reason of the foregoing, the Defendants have violated Nev. Rev. Stat. Ann. § 598A.010, et seq.

e) Accordingly, Plaintiffs and members of the Class seek all relief available under Nev. Rev. Stat. Ann. § 598A.010, et seq.

82. The Defendants have violated the New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-1, et seq.

a) The Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout New Mexico; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout New Mexico; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

b) During the Class Period, the Defendants' illegal conduct substantially affected New Mexico commerce.

c) As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, the Defendants have violated N.M. Stat. Ann. § 57-1-1, et seq.

e) Accordingly, Plaintiffs and members of the Class seek all relief available under N.M. Stat. Ann. § 57-1-1, et seq.

83.     The Defendants have violated New York's Donnelly Act, N.Y. Gen. Bus. Law §
340, et seq.

a)      The Defendants' agreements, contract, or combinations had the following
effects: (i) price competition in the relevant markets was restrained,
suppressed, and eliminated throughout New York; (ii) prices for products
or services purchased by Plaintiffs and members of the Class were raised
at artificially high levels throughout New York; (iii) Plaintiffs and
members of the Class were deprived of free and open competition; and
(iv) Plaintiffs and members of the Class paid artificially inflated prices for
products or services purchased using MasterCard, Visa, or Discover
payment cards, or purchased products that were otherwise of lower quality
than they would have been absent the Defendants' and their co-
conspirators' illegal acts, or were unable to purchase products that they
would have otherwise have purchased absent the illegal conduct.

b)      During the Class Period, the Defendants' illegal conduct substantially
affected New York commerce.

c)      As a direct and proximate result of the Defendants' unlawful conduct,
Plaintiffs and members of the Class have been injured in their business
and property and are threatened with further injury.

d)       By reason of the foregoing, the Defendants have violated the New York
Donnelly Act, N.Y. Gen. Bus. Law § 340, et seq. The conduct set forth
above is a per se violation of the Act.

e)    Accordingly, Plaintiffs and members of the Class seek all relief available under N.Y. Gen. Bus. Law § 340, et seq.

84.    The Defendants have entered into unlawful restraints of trade in North Carolina violating N.C. Gen. Stat. § 75-1, et seq.

a)    The Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout North Carolina; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout North Carolina; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

b)    During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce.

c)    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d)    By reason of the foregoing, the Defendants have violated N.C. Gen. Stat. § 75-1, et seq.

e)    Accordingly, Plaintiffs and members of the Class seek all relief available under N.C. Gen. Stat. § 75-1, et. seq.

85.     The Defendants have entered into unlawful restraints of trade, violating North Dakota's States Uniform Antitrust Act, N.D. Cent. Code § 51-08.1-01, et seq.

a)      The Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout North Dakota; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout North Dakota; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

b)      During the Class Period, the Defendants' illegal conduct had a substantial effect on North Dakota commerce.

c)      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d)      By reason of the foregoing, the Defendants have violated N.D. Cent. Code § 51-08.1-01, et seq.

e)      Accordingly, Plaintiffs and members of the Class seek all relief available under N.D. Cent. Code § 51-08.1-01, et seq.

86.     The Defendants have violated the Oregon Revised Statutes § 646.705, et seq.

a)      The Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant markets was restrained,

suppressed, and eliminated throughout Oregon; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout Oregon; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

b)      During the Class Period, the Defendants' illegal conduct had a substantial effect on Oregon commerce.

c)      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d)      By reason of the foregoing, the Defendants have violated Oregon Revised Statutes § 646.705, et seq.

e)      Accordingly, Plaintiffs and members of the Class seek all relief available under Oregon Revised Statutes § 646.705, et seq.

87.     The Defendants have violated the South Dakota Codified Laws § 37-1-3.1, et seq.

a)      The Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout South Dakota; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout South Dakota; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially

inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

b)   During the Class Period, the Defendants' illegal conduct had a substantial effect on South Dakota commerce.

c)   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d)   By reason of the foregoing, the Defendants have violated South Dakota Codified Laws § 37-1, et seq.

e)   Accordingly, Plaintiffs and members of the Class seek all relief available under South Dakota Codified Laws Ann. § 37-1, et seq.

88.   The Defendants have violated the West Virginia Antitrust Act, W. Va. Code § 47-18-1, et seq.

a)   The Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout West Virginia; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout West Virginia; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

b) During the Class Period, the Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c) As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, the Defendants have violated W. Va. Code § 47-18-1, et seq.

e) Accordingly, Plaintiffs and members of the Class seek all relief available under W. Va. Code § 47-18-1, et seq.

89. The Defendants have violated the Wisconsin Statutes § 133.01, et seq.

a) The Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout Wisconsin; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout Wisconsin; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

b) During the Class Period, the Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c)      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d)      By reason of the foregoing, the Defendants have violated Wisc. Stat. § 133.01, et seq.

e)      Accordingly, Plaintiffs and members of the Class seek all relief available under Wisconsin Stat. § 133.01, et seq.

90.     Plaintiffs and members of the Class in each of the above states have been injured in their business and property by reason of the Defendants' unlawful agreements, contracts, or combinations. Plaintiffs and members of the Class have paid more for products and services purchased using MasterCard, Visa, or Discover than they otherwise would have paid in the absence of the Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

91.     In addition, the Defendants have profited significantly from the aforesaid conduct in illegal restraint of trade. The Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Class.

92.     Accordingly, Plaintiffs and the members of the Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## COUNT TWO

**(VIOLATION OF STATE CONSUMER PROTECTION STATUTES)**

93.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

94.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices that have violated various state consumer protection and unfair competition statutes.

95.     The Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices violating Cal. Bus. & Prof. Code § 17200, et seq.

  a)     During the Class Period, the Defendants committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code § 17200, et seq., by engaging in the acts and practices specified above;

  b)     This claim is instituted pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, to obtain restitution from the Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code § 17200, commonly known as the Unfair Competition Law;

  c)     The Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of the Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200, et seq., including, but not limited to, the following: (i) the violations of Section 1 of the

Sherman Act, as set forth above; (ii) the violations of Cal. Bus. & Prof. Code § 16720, et seq., set forth above;

d) The Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, violated Cal. Bus. & Prof. Code § 16720, et seq., and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

e) The Defendants' acts or practices are unfair to members of the Class in the State of California within the meaning of Cal. Bus. & Prof. Code § 17200; and

f) The Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code § 17200.

g) Plaintiffs and members of the Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by the Defendants as a result of such business acts or practices.

h) The illegal conduct alleged herein is continuing and there is no indication that the Defendants will not continue such activity into the future.

i) The unlawful and unfair business practices of the Defendants have caused and continue to cause Plaintiffs and the members of the Class to pay artificially-inflated prices for products or services. Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

j)     The conduct of the Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code § 17200.

k)     As alleged in this Complaint, the Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by the Defendants' unfair competition. Plaintiffs and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by the Defendants as a result of such business practices, pursuant to the Cal. Bus. & Prof. Code §§ 17203 and 17204.

96.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, et seq.

a)     The Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, at artificial and/or non-competitive levels, the prices at which products or services were purchased by members of the Class using MasterCard, Visa, or Discover payment cards in the District of Columbia.

b)     The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

c)     The Defendants' unlawful conduct had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout the District of Columbia; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at

artificially high levels throughout the District of Columbia; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

d)  Plaintiffs and members of the Class have been injured and are threatened with further injury. The Defendants have engaged in unfair competition or unfair or deceptive acts or practices violating D.C. Code § 28-3901, et seq., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

97.  The Defendants have engaged in unfair competition violating the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") which "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.204(1).

a)  During the Class Period, the Defendants entered into and engaged in continuing unlawful agreements, contracts, or combinations in restraint of the trade and commerce described above in violation of Fla. Stat. Ann. § 542.15, et seq. These unlawful contracts were entered into and effectuated within the State of Florida.

b)  This conduct constitutes an unfair trade practice under FDUTPA.

c)   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and seek their

actual damages, attorneys' fees and costs pursuant to Fla. Stat. Ann. § 501.211.

98.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico's Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, et seq.

a)     The Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting at noncompetitive and artificially inflated levels, the prices at which Plaintiffs and members of the Class purchased products or services using MasterCard, Visa, or Discover payment card systems in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Class.

b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M. Stat. Ann. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the members of the Class and the prices paid by them for products or services purchased using MasterCard, Visa, or Discover payment card systems as set forth in N.M. Stat. Ann. § 57-12-2E.

c)     The Defendants' unlawful conduct had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout New Mexico; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout New Mexico; (iii) Plaintiffs and

members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

d)      During the Class Period, the Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

e)      As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured and are threatened with further injury.

f)      The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, et seq., and, accordingly, Plaintiffs and the members of the Class seek all relief available under that statute.

99.     The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, et seq.

a)      The Defendants and their co-conspirators agree to, and did in fact, act in restraint of trade or commerce by affecting at artificial and non-competitive levels, the prices at which Plaintiffs and members of the Class purchased products or services using MasterCard, Visa, or Discover payment card systems in New York and took efforts to conceal their agreements from Plaintiffs and members of the Class.

b)      The Defendants' conduct described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law §

349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

c)  The Defendants' unlawful conduct had the following effects: (i) price competition in the relevant markets was restrained, suppressed, and eliminated throughout New York; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout New York; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

d)  During the Class Period, the Defendants' illegal conduct substantially affected New York commerce and consumers.

e)  During the Class Period, the Defendants directly or indirectly dominated and controlled the relevant markets in New York.

f)  Plaintiffs and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

100.  The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, et seq.

a)  The Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting at artificial and non-competitive levels, the prices

at which Plaintiffs and members of the Class purchased products or services using MasterCard, Visa, or Discover payment card systems in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Class.

b)  The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

c)  The Defendants' unlawful conduct had the following effects: (1) price competition in the relevant markets was restrained, suppressed, and eliminated throughout North Carolina; (2) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using MasterCard, Visa, or Discover payment cards.

d)  During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

e)  During the Class Period, the Defendants directly, or indirectly dominated and controlled the relevant markets in North Carolina.

44

f)      Plaintiffs and members of the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT THREE

### (UNJUST ENRICHMENT)

101.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

102.    As the result of the Defendants' conduct, Defendants have received benefits from Plaintiffs and other Class members in the State Damages Classes *via* inequitable, unconscionable, and unjust methods.

103.    Under the circumstances, it unjust is to permit Defendants to retain said benefits without paying this reasonable value for same to Plaintiffs and other Class members.

104.    Defendants used their Anti-Steering Rules as a foundation to raise their merchant discount rates during the Class Period, reaping ill-gotten gains.

105.    To the extent Plaintiffs are required by any state's law to have exhausted administrative remedies before bringing an unjust enrichment claim, exhaustion of any such remedies is not required in this instance because:

a)      the issues are of the type that would be appropriate for judicial determination,

    b)       the Plaintiffs would suffer substantial hardship if compelled to exhaust remedies, and

    c)       applying the doctrine here would result in substantial inequity and economic inefficiency and violate public policy.

106.    As a direct and proximate result of the Defendants' unjust enrichment, Plaintiffs and Class members are injured, and thus seek an order directing Defendant to return to them the amount each of them improperly paid to the Defendants, plus any applicable interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment adjudging and decreeing that:

A.    this matter is afforded class action status, with Plaintiffs Andrew Amend, Igor Gelman, Susan Burdette, and Zachary Draper as the designated Class representatives (or where appropriate, subclass representatives) and Plaintiffs' counsel as Class Counsel, and further directing this matter to proceed as a class action in accordance with Fed. R. Civ. P. 23(b)(3);

B.    the Defendants' actions as described herein violate state antitrust laws and concluding that Plaintiffs and their fellow Class members have sustained injury as a result thereof;

C.    that American Express's Anti-Steering Rules are illegal, that that they shall be rescinded;

D.    that Plaintiffs and the members of the Class may recover damages sustained by them, as provided by state antitrust and consumer protection laws, and that a judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount to be determined in accordance with applicable law;

E.   that Plaintiffs and their fellow Class members may recover restitution in an amount to be proven at trial, as a result of Defendants' unjust enrichment;

F.   that Plaintiffs and their fellow Class members be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.   that Plaintiffs and their fellow Class members recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H.   that Plaintiffs and their fellow Class members receive such other and further relief as may be just and proper under law and equity.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury.

DATED: June 17, 2015                              Respectfully submitted:

<u>*s/ Kim E. Miller*</u>
**KAHN SWICK & FOTI, LLC**
Kim E. Miller
kim.miller@ksfcounsel.com
250 Park Avenue, Suite 2040
New York, New York 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498

Melinda A. Nicholson
melinda.nicholson@ksfcounsel.com
206 Covington Street
Madisonville, Louisiana 70477
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Attorneys for Plaintiffs*